UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ASHLEY KRONE, *an individual*,

          Plaintiff,

   v.

LEGACY HEALTH, *a corporation*,

          Defendant.

Case No. 3:22-cv-01986-AR

**AMENDED
FINDINGS AND
RECOMMENDATION**

_____

**ARMISTEAD, United States Magistrate Judge**

      Plaintiff Ashley Krone sues her former employer, Legacy Health, alleging that it

unlawfully discriminated against her when it denied her request for a religious exemption to its

COVID-19 vaccine mandate. According to Krone, Legacy's refusal to accommodate her

religious beliefs by allowing her to work while unvaccinated violated Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Oregon's statutory parallel, ORS

§ 659A.030(1)(A). (Compl. at 5-6, ECF 1.)

Legacy moves for summary judgment on its affirmative defense asserting that permitting Krone to work while unvaccinated would have imposed an undue hardship on Legacy. Legacy provides evidence that, at the time of the vaccine mandate, Legacy was experiencing a spike in COVID-19 hospitalizations, the scientific consensus was that the vaccines were safe and effective, other preventive measures had shortcomings that vaccination did not, and Legacy needed its direct patient care employees (like Krone) to continue working in person and in close contact with patients. (MSJ, ECF 14.)

Krone responds that the vaccine was ineffective, so allowing her to work without it would not have affected the safety of Legacy's patients or employees. (MSJ Resp., ECF 24.) She relies on the expert opinion of Dr. Richard Scott French, who states that the vaccines were ineffective, unsafe, and unnecessary. (French Report, ECF 25 at 4-150 & ECF 25-1 at 1-162.) Krone also contends that Legacy has failed to show that accommodating her individually would have imposed a significant burden on the operation of its business, or that Legacy ever performed an individualized analysis of Krone's request.

Legacy also moves to strike the French Report under Federal Rule of Evidence 702. (Mot. Strike, ECF 29). The court addresses that motion first and concludes that, because French's relevant opinions are unsupported by the scientific literature he relies on or are based on unreliable sources, Legacy's motion to strike should be GRANTED.

Without French's opinion, there are no genuine issues of material fact, and Legacy has established that it could not have accommodated Krone's religious beliefs without undue hardship. Accordingly, Legacy's motion for summary judgment should be GRANTED.[1]

## BACKGROUND

Krone worked for Legacy as a registered nurse for close to 8 years, in one of Legacy's Portland, Oregon facilities. In 2021, she worked directly with patients in the Trauma Recovery and Acute Care Unit (TRACU). (Clouser Decl. ¶ 15, ECF 16; MSJ at 8.)

Legacy is a regional healthcare provider. It operates eight hospitals in Oregon and Washington, and has 14,000 employees and 3,000 "allied health care providers." (Muller Decl. ¶ 4, ECF 18.)

The COVID-19 pandemic "represented an unprecedented challenge" for Legacy. (*Id.* ¶ 7.) In navigating the pandemic, Legacy's Senior Leadership Team (SLT) relied on guidance from the Centers for Disease Control and Prevention, the Oregon Health Authority, and the Washington State Health Care Authority. Legacy also relied on "the expertise of its own clinical leaders." (*Id.*) "The SLT's overarching goals were to ensure that Legacy, as a major regional healthcare provider, provided the safest possible environment for patients and employees, while maintaining public trust in Legacy's capabilities during a major global event." (*Id.*)

Faced with the challenge of limiting the spread of COVID-19 in its facilities, Legacy implemented an Infection Control Plan. That plan, which evolved as the pandemic progressed,

---

[1]     Legacy requests oral argument. The court, however, does not believe that oral argument would help resolve the pending motions. *See* LR 7-1(d)(1).

included "carefully tracking and monitoring patient and employee infections." (*Id.* ¶ 10.) Legacy employees were required to wear PPE and practice social distancing. (*Id*.) Legacy prioritized testing individuals with suspected exposure to the virus and required employees who tested positive or showed symptoms to isolate at home. (*Id.* ¶ 11.) PPE and tests were "in short supply nationwide" in 2020 and 2021, and could be difficult to acquire. (*Id.* ¶¶ 12-13.)

In late 2020, COVID-19 hospitalizations at Legacy surged. On December 1, 2020, for example, Legacy treated 126 patients who had been hospitalized after testing positive for COVID-19. During that surge, Legacy obtained refrigerated trailers to expand its morgue capacity. (*Id.* ¶ 16.)

Around the same time, Legacy received its first doses of COVID-19 vaccines. (*Id.* ¶ 19.) By mid-January 2021, Legacy had provided 11,000 vaccines to its employees. (*Id.* ¶ 20.) Legacy's vaccine rollout was soon followed by a decrease in COVID-19 patient hospitalizations: by February, the number of patients hospitalized with COVID-19 had decreased 83 percent from December's high. (*Id.* ¶ 26.)

Legacy's push to provide vaccinations to its employees continued and, by March 2021, about 70 percent of Legacy employees had been vaccinated. (*Id.* ¶ 22.) Legacy introduced vaccine-related incentives, and its employees who were vaccinated increased about 81 percent by June, and 84 percent by July. (*Id.* ¶ 24.) In July 2021, about 2,240 of Legacy's employees remained unvaccinated. (*Id.* ¶ 25.)

In the second half of July, the Delta variant predominated new COVID-19 cases. (*Id.* ¶ 28.) And Legacy's internal forecasts and Oregon's statewide COVID-19 forecasting model (developed by OHSU epidemiologist Dr. Peter Graven) predicted a forthcoming surge in

COVID-19 cases. (*Id.* ¶ 27.) By late July, Legacy was forecasting that COVID-19 hospitalizations in August would be higher than any other month during the pandemic. (*Id.* ¶ 29 & Exs. 17-18.) And by August 2, the forecasts had only gotten worse, and COVID-19 hospitalization rates for the month were expected to far surpass previous records. (*Id.* ¶ 29 & Ex. 19.)

Legacy responded to the surge of COVID-19 hospitalizations in the summer of 2021 by pausing "non-emergency surgical procedures" and restricting who could visit hospitals. (*Id.* ¶ 30.) Even so, "there was a strong consensus among the SLT that those efforts, along with the safety measures that Legacy employees had taken throughout the pandemic, would not be enough given the gravity of what Legacy and other health systems were facing and the medical science at the time about the importance of vaccination against COVID-19." (*Id.*)

On August 5, 2021, Legacy announced its vaccination policy, which required employees to become vaccinated or receive a religious or medical exemption by September 30, 2021. The vaccine policy applied to all Legacy employees, as well as contractors, vendors, and others providing services at Legacy locations. Legacy later extended the deadline to October 18, 2021. (*Id.* ¶ 31.) Hundreds of Legacy employees requested exemptions. (*Id.* ¶ 41.)

This included Krone, but Legacy denied her request for a religious exemption. (ECF 15-2.) Because Krone never received the vaccine, in October 2021, Legacy placed her on unpaid leave and then fired her. (Clouser Decl. ¶ 16-17, ECF 16; *see also* MSJ Resp.)

\ \ \ \ \

\ \ \ \ \

\ \ \ \ \

Page 5 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

## SUMMARY JUDGMENT STANDARDS

A party is entitled to summary judgment if it demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Undue hardship is an affirmative defense," *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1224 (9th Cir. 2023), and the party asserting it has the burden of proof at trial. When the party seeking summary judgment will have the burden of proof on an issue at trial, that party must establish the absence of a genuine issue of material fact to prevail on summary judgment. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986); *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party—here Krone. *Curley v. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). But deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Chong v. STL Int'l, Inc.*, 152 F. Supp. 3d 1305, 1309 (D. Or. 2016). Where "the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

## MOTION TO STRIKE[2]

In opposing Legacy's motion for summary judgment, Krone relies on the expert report of French, a board-certified emergency medicine physician with "extensive personal experience and expertise in setting up COVID-19 prevention protocols for hospital facilities." (French Report ¶ 2.) After the COVID-19 pandemic began, French established and oversaw COVID-19 transmission mitigation policies in four California emergency departments. Once French's policies were "fully implemented, there were no hospital-wide or community-wide outbreaks of COVID-19 caused by emergency room patients or staff." (*Id.* ¶ 8.) French "also managed a mixed-age private community population (which included school-aged children) in Hawaii regarding COVID-19 testing, prevention, transmission mitigation[,] and treatment." (*Id.* ¶ 9.)

Legacy moves to exclude the French Report, for four reasons: (1) he does not qualify as an expert on the topics he addresses in his report; (2) his conclusions are irrelevant; (3) his conclusions are unsupported by sufficient facts and data; and (4) his opinions are unreliable. (Mot. Strike at 6-7.) In support of its motion, Legacy submits a rebuttal report by Dr. Seth Cohen, a board-certified physician in internal medicine and infectious disease (Cohen Report at 15, ECF 15-3), in which Cohen contends that French misrepresents much of the literature he

---

[2]     Under LR 56-1(b), "[r]ather than filing a motion to strike," Legacy should have "assert[ed] any evidentiary objections in its . . . reply." Even so, the court will consider Legacy's objections to the French report as they relate to the issues on summary judgment.

relies on and cites studies that were based on unreliable methods. (Cohen Rebuttal Report, ECF 30 at 3-21.) In responding to Legacy's motion to strike the French Report, neither Krone nor French (in his report in support of Krone's response to the motion to strike) disputes the methodological flaws identified by Cohen. Instead, Krone asserts that Legacy's "specific attacks on French's reliability can be explored on cross-examination" (Resp. Mot. Strike at 11), and French reprises his reliance on medical literature from 2022, 2023, and 2024—after the relevant time period. (French Resp. Report ¶¶ 16-20). The court agrees with Legacy that French's relevant opinions lack foundation or are unreliable, and must be excluded.

As to Legacy's view that some of French's opinions are irrelevant, relevance objections are moot in the summary judgment context because they are "duplicative of the summary judgment standard itself." *Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021). The court observes that many statements in French's report, including his criticisms of Legacy's Senior Leadership Team and his speculations as to what "a reasonable layperson" would have expected in various scenarios, are not facts material to any genuine issue necessary to resolve Legacy's undue hardship defense. Likewise, French's legal conclusions, such as his opinions on emergency use authorizations for the COVID-19 vaccines, are unhelpful in resolving Legacy's motion for summary judgment.

A.     *Legal Standard*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

Page 8 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"Rule 702's 'sufficient facts or data' element requires foundation, not corroboration." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1026 (9th Cir. 2022). It is not the court's role "to determine whether an expert's hypothesis is correct, or to evaluate whether it is corroborated by other evidence on the record." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594-95 (1993)). Expert testimony should be excluded, however, when a court "conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." *Elosu*, 26 F.4th at 1026 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

In examining the reliability of scientific opinions, the court examines "(1) whether the theory can be and has been tested, (2) whether the theory has been peer reviewed and published, (3) what the theory's known or potential error rate is, and (4) whether the theory enjoys general acceptance in the applicable scientific community." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 593-94). The proponent must show that its expert's opinion is *reliable* but does not have to show that it is *correct*. Advisory Committee's Note to 2023 Amend. to FED. R. EVID. 702.

It is the proponent of expert testimony that has the burden of showing, by a preponderance of the evidence, that the proposed testimony is admissible under Rule 702. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). In evaluating expert testimony, the trial

court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The inquiry into the admissibility of an expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564.

**B.    *Analysis***

Krone relies on three central opinions from the French Report to oppose summary judgment: (1) the vaccines were ineffective; (2) the vaccines were unsafe; and (3) other preventive measures would have been just as effective in preventing COVID-19 transmission.

As to the first of those opinions, French's view that the COVID-19 vaccines were "not effective in preventing COVID-19 transmission" and therefore "did not confer a benefit" (French Report ¶ 26), is based on his review of "[t]he literature," which he says "does not support the assertion that the COVID-19 vaccines were effective in preventing infection." (*Id*. ¶ 15.) "The literature" consists of three sources: the Outbreak Report[3] (French Report Ex. 2), the Cohort

---

[3]    Brown, Catherin M. *Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gathering—Barnstable County, Massachusetts, July 2021.* Morbidity and Mortality Wkly. Rep. 70 (2021). https://doi.org/10.15585/mmwr.mm7031e2.

Study[4] (*id.* Ex. 3), and the Fauci Article[5] (*id.* Ex. 4). (*Id.* ¶¶ 15-17.) But none of those sources

supports French's conclusion.

       The Outbreak Report is a July 2021 report about COVID-19 transmission associated with

a large public gathering in Massachusetts. In French's view, because the Delta variant "is highly

transmissible" and the Outbreak Report found that 74 percent of the relevant transmissions

occurred in fully vaccinated individuals, the report shows that vaccinations were not "effective in

preventing infection." (French Report ¶ 15.) Yet the Outbreak Report concludes that "vaccination

is the most important strategy to prevent severe illness and death" (Outbreak Report at 2), and

cautions that "data from this report are insufficient to draw conclusions about the effectiveness of

COVID-19 vaccines against SARS-CoV-2, including the Delta variant, during this outbreak."

(*Id.* at 3.) In other words, the Outbreak Report cautioned readers against drawing the very

conclusion that French draws here. It explains that "[a]s population-level vaccination coverage

increases, vaccinated persons are likely to represent a larger proportion of COVID-19 cases."

(*Id.*) The Outbreak Report simply does not support French's opinion. "Rather, the mismatch

between Dr. French's opinion and the findings and recommendations of the [Outbreak Report],

calls into question his capacity to comprehend scientific literature." *Sano v. Peacehealth*, 6:22-

---

[4]    Singanayagam Anika, *et al.*, *Community Transmission and Viral Load Kinetics of the SARS-CoV-2 Delta (B.1.617.2) Variant in Vaccinated and Unvaccinated Individuals in the UK: A Prospective, Longitudinal, Cohort Study*. The Lancet, Infectious Diseases 22, no. 2, 183-95 (Feb. 2022). https://doi.org/10.1016/S1473-3099(21)00648-4.

[5]    David M. Morens, Jeffery K. Taubenberger, and Anthony S. Fauci, Cell Host & Microbe 31, no.1 (January 11, 2023).

cv-01210-MTK, 2024 WL 4979429, at *4 (D. Or. Dec. 4, 2024) (discussing French's reliance on the same Outbreak Report in a substantially similar expert report).

The Cohort Study, published online in 2021, examined community transmission in vaccinated and unvaccinated individuals in the United Kingdom. (Cohort Study at 1.) As French observes in his report, the study concluded:

> Vaccination reduces the risk of the delta variant infection and accelerates viral clearance. Nonetheless, fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in a household setting, including to fully vaccinated contacts.

(French Report ¶ 16 (quoting Cohort Study at 1).) Without explanation, French cites the Cohort Study as support for his opinion that literature contemporaneous with Legacy's vaccination mandate cast doubt on the belief that the vaccine was effective in preventing infection. (*See* French Report ¶ 16.) But the first line of the block quote French relies on contradicts his characterization when it concludes that vaccination *reduces the risk of infection* while accelerating recovery. (Cohort Study at 1); *see also Sano*, 2024 WL 4979429, at *5 (concluding that "French's opinion directly contradicts the scientific research it relies on" and that his interpretation of the Cohort Study is "at best incompetent, and at worst, dishonest").

French's reliance on the Fauci Article fares no better. The article addresses "challenges that have impeded development" of effective vaccines to viruses like SARS-CoV-2, and "discuss[es] possible approaches to developing next-generation vaccines against these viruses." (Fauci Article at 1.) As French notes, the article concludes that, because respiratory viruses like SARS-CoV-2 (and the common flu) rapidly evolve, current vaccines "elicit incomplete and short-lived protection against evolving virus variants that escape population immunity." (French

Report ¶ 17 (quoting Fauci Article at 1).) But that is different from saying that the vaccines were "not effective in preventing infection." (French Report ¶ 26.) In any case, the Fauci Article was published in 2023, and therefore cannot support an opinion about the scientific consensus around vaccines in 2021. *See, e.g.*, *Hailey v. Legacy Health*, 3:23-cv-00149-IM, 2024 WL 4253238, at *9 (D. Or. Sept. 20, 2024) ("[I]t is appropriate to confine the [undue hardship] analysis to the information available to the employer when it made its undue hardship decision."); *Malone v. Legacy Health*, 3:22-cv-01343-HZ, 2024 WL 3316167, at *3 (D. Or. July 5, 2024) (concluding that articles published after Legacy had implemented its vaccine mandate were not relevant to undue hardship defense).

French also opines that the vaccines were unsafe. That conclusion is based on his risk/benefit analysis, as he notes that "[e]very treatment has a risk, and thus the benefit must far exceed the risk of treatment." (French Report ¶ 26.) French opines that "even a small risk is unacceptable" in the case of the COVID-19 vaccines because the vaccines conferred no benefit. (*Id.*) As the court has just explained, his opinion that the vaccines conferred no benefit is unsupported by the evidence he relies on, and his risk/benefit analysis that depends on that conclusion likewise lacks foundation. He also bases his opinion on three studies that were published in 2022 and 2023, which have no bearing on the scientific consensus regarding the safety of the COVID-19 vaccines at the time of Legacy's actions in 2021.[6]

---

[6]     Besides that, one of the studies identifies potential adverse from the COVID-19 vaccines but states that it was "not designed to evaluate the overall harm-benefit of vaccination programs" (French Report Ex. 6 at 2); another is "non-peer reviewed" (Cohen Decl. ¶ 6) and has been deemed "junk science" by another court in this district, because its "methodology is grossly flawed," and its conclusions contradict its own data, *Sano*, 2024 WL 4979429, at *4; (French

Finally, French opines that he was able to mitigate the transmission of COVID-19 in the emergency departments he managed without mandating employee vaccinations. (French Report ¶¶ 12-13.) French does not see the logic in "giving up a proven effective strategy of transmission, mitigation, and transmission of the virus for a vaccine that was proven to be ineffective." (*Id.* ¶ 23.) Krone relies on this opinion to show that Legacy could have allowed her to work unvaccinated without any increased risk of COVID-19 transmission. (MSJ Resp. at 5-7.) French's opinion does not support Krone's contention, for three reasons. First, French provides no details as to the unnamed emergency departments he managed or the COVID-19 prevention measures he implemented there, and acknowledges that "[a]ll clinical sites had unique challenges[.]" (French Report ¶ 12.) His discussion of the success of other protocols in unidentified facilities "does not reasonably cast doubt on [Legacy]'s evidence as to its own facilities in Portland." *Malone*, 2024 WL 3316167, at *3 (discussing identical report by French). Second, French bases his opinion on his understanding that Legacy gave up other infection-prevention methods, a notion that is contradicted by the record. (*See, e.g.*, Clouser Decl. ¶ 23.) And third, his conclusion is also grounded in his opinion that the vaccine was "ineffective," an opinion the court has already excluded as lacking foundation in sufficient facts and data.

In sum, Krone has failed to meet her burden to establish the admissibility of French's relevant opinions under Rule 702. "[T]here is simply too great an analytical gap between the data and the opinions proffered." *Elosu*, 26 F.4th at 1026. This court joins others in this

---

Report Ex. 7 at 1-3, 26, 113, 131); and Krone does not dispute that the third was funded by an antivaccine advocacy group, that its lead author lacks training in scientific research, infectious disease, or epidemiology, or that the report "fails to acknowledge" relevant scientific evidence. (Mot. Strike at 26-27; Resp. Mot. Strike at 10-11, ECF 34.)

district that have concluded that French's opinions do not satisfy Rule 702's requirements. *Sano*, 2024 WL 4979429, at *3 (holding that "every portion of [the French Report] falls below the admissibility standard"); *see also Malone*, 2024 WL 3316167, at *3 (denying Legacy's motion to strike as moot but noting that scientific articles French relied on were either "misconstrued" or "irrelevant").

## MOTION FOR SUMMARY JUDGMENT

### A.    *Krone's Claims*

Failure-to-accommodate claims under Title VII and ORS § 659A.030 are analyzed under a two-part burden-shifting framework. *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 681 (9th Cir. 1998); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1437 n.2 (9th Cir. 1993) (noting that courts construe ORS § 659.030 "as identical to Title VII"; collecting cases). A plaintiff must first plead a *prima facie* case of religious discrimination by establishing that: (1) she had a *bona fide* religious belief, the practice of which conflicted with a job requirement; (2) she informed her employer of the belief and conflict; and (3) the employer discharged her because she could not fulfill the job requirement. *Tiano*, 139 F.3d at 681; *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). If an employee articulates a *prima facie* case, the burden shifts to the employer to show that it made good-faith efforts to reasonably accommodate the religious practice, or that it could not accommodate without undue hardship. *Id.*

For purposes of summary judgment, Legacy does not dispute that Krone states a *prima facie* case of religious discrimination for failure to accommodate. So the burden is on Legacy to show that it "initiated good faith efforts to accommodate reasonably [Krone]'s religious practices or that it could not reasonably accommodate [her] without undue hardship." *Peterson*, 358 F.3d

Page 15 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

at 606. Because Legacy has that burden, it "must affirmatively demonstrate that no reasonable

trier of fact could find other than for the moving party." *Soremekun, Inc.*, 509 F.3d at 984. If

Legacy, as the moving party, meets its initial burden, Krone, as the nonmoving party, must

present, "by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250); FED.

R. CIV. P. 56(e).

Krone posits a different framework. In her view, failure-to-accommodate claims must be

analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). (MSJ Resp. at 9 n.2, 17-18.) Under that framework, once a plaintiff has

established a *prima facie* case of discrimination, the burden shifts to the defendant to provide a

"legitimate, nondiscriminatory reason" for the adverse employment decision. If the defendant

does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason is

pretext. (*See* MSJ Resp. at 17.)

The *McDonnell-Douglas* framework to which Krone refers is not applicable here. It

addresses disparate treatment claims, "in which proof of intent to discriminate is required."

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 988 (1988) (citing *McDonnell Douglas* as an

example of a disparate treatment case). In a disparate treatment case, the *McDonnell-Douglas*

framework is one means through which a plaintiff can create an inference that an adverse

employment action was motivated by discriminatory intent. *Opara v. Yellen*, 57 F.4th 709, 721

(9th Cir. 2023). Such a framework is of no use when analyzing a claim that an employer

discriminated by failing to accommodate the plaintiff's religious beliefs or practices, because

discriminatory intent is not an element of a failure-to-accommodate claim. *Peterson*, 358 F.3d at

Page 16 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

606 (setting out elements of failure-to-accommodate claim); *id.* at 603-06 (setting out different burden-shifting frameworks for disparate treatment and failure-to-accommodate claims); *Berry v. Dep't of Social Servs.*, 447 F.3d 642, 655-56 (9th Cir. 2006) (same); *see also Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1149 (D. Or. 2024) (noting that plaintiffs' arguments that defendant acted with discriminatory motive were irrelevant to failure-to-accommodate claims).

For the same reason, Krone's assertion that "there is compelling evidence that the defendant's claim of undue hardship was pretextual to mask hostility toward plaintiff's religion" (MSJ Resp. at 17-18 (emphasis and capitalization omitted)), is irrelevant to resolving Legacy's motion. *See, e.g.*, *MacDonald v. Or. Health & Sci. Univ.*, 3:22-cv-01942-IM, 2024 WL 3316199, at *5 (D. Or. July 5, 2024) ("Defendant's allegedly discriminatory motives are not material to Plaintiff's Title VII claim for failure to accommodate, and so any related disputes of fact do not preclude summary judgment here.").

**B.    *Undue Hardship***

An employer need not make any and all accommodations requested by an employee for religious reasons. Instead, "Title VII requires that an employer *reasonably accommodate* an employee's practice of religion[.]" *Groff v. DeJoy*, 600 U.S. 447, 473 (2023) (emphasis added). That is, the statute "requires employers to accommodate the religious practice of their employees unless doing so would impose an 'undue hardship' on the conduct of the employer's business." *Id.* at 453-54 (quoting 78 Stat. 253, as amended, 42 U.S.C. § 2000e(j)).

In 2023, the Supreme Court in *Groff* addressed the standard for undue hardship. 600 U.S. at 468-71. Before *Groff*, lower courts looked to *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977), and understood it as relieving an employer of the duty to provide a religious

accommodation if it could show that doing so would impose "more than . . . de minimis" cost. *See, e.g.*, *Balint v. Carson City*, 180 F.3d 1047, 1053-54 (9th Cir. 1999). Not true, said the *Groff* court: the "more than a de minimis cost" test was a mistaken view of *Hardison*. The Court explained that an employer must accommodate an employee's religious beliefs unless it can show that doing so would "result in substantial increased costs in relation to the conduct of" the employer's business. *Groff*, 600 U.S. at 470.

The Court examined decades of regulations and guidance from the Equal Employment Opportunity Commission directed toward applying "undue hardship" and determined that "a good deal of the EEOC's guidance in this area is sensible." *Id.* at 471. After all, for decades, the EEOC's interpretation and guidance notified employers (and employees) that "temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs" did not constitute an "undue hardship." *Id.* (citing 29 C.F.R. § 1605.2(d)). Lower courts must consider "whether a hardship would be substantial in the context of an employer's business *in the commonsense manner that it would use in applying any such test*." *Id.* (emphasis added).

Pre-*Groff* EEOC guidance thus remains instructive. The EEOC provides the following guidance regarding undue hardship in the context of COVID-19 vaccination:

> Certain common and relevant considerations during the COVID-19 pandemic include, for example, whether the employee requesting a religious accommodation to a COVID-19 vaccination requirement works outdoors or indoors, works in a solitary or group work setting, or has close contact with other employees or members of the public (especially medically vulnerable individuals). Another relevant consideration is the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer.

*What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* (EEOC Guidance), EEOC (§ L.3, Updated March 1, 2022) (last visited May 5, 2025), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-adarehabilitation-act-and-other-eeo-laws [https://perma.cc/LV2V-6YTV].

With that explanation of undue hardship in hand, the court turns to Legacy's contention that it could not reasonably accommodate Krone's religious beliefs. Legacy has identified two categories of burdens that it would have faced in accommodating Krone's request: (1) the economic and noneconomic costs associated with regularly testing Krone; and (2) the increased risk of infection of its patients and employees if it allowed Krone to work while unvaccinated—even if she wore PPE, submitted to regular testing, and followed other preventive measures.

Turning first to the costs of testing:

Legacy estimated that it would cost approximately $170,000 per week to purchase the COVID-19 tests needed to test its unvaccinated employees, $470,00[0] to purchase the additional laboratory supplies needed for testing its unvaccinated employees, and $60,000 plus employment benefits to hire additional lab personnel to process its employees' COVID-19 tests. In addition, routinely testing unvaccinated Legacy employees would have delayed the rate at which Legacy could process COVID-19 tests for its patients - diminishing Legacy's standard of care.

(Muller Decl. ¶ 37.) Even setting aside the monetary costs, that routine testing of unvaccinated employees would have delayed Legacy's processing of patients' COVID-19 tests is a significant burden in the context of Legacy's business as a health care provider. *See Hailey*, 2024 WL 4253238, at *9 (D. Or. Sept. 20, 2024) ("[I]t is appropriate to consider not only calculable economic costs but also non-economic costs, like the cost to an employer's mission and potential safety risks to other employees, in analyzing undue hardship." (collecting cases)).

Krone does not dispute Legacy's assertions about the economic and noneconomic costs of testing. Rather, she argues that Legacy has failed to show that accommodating *her* would have imposed substantial testing costs. (MSJ Resp. at 15.) That is, she says that only the costs of accommodating her individually are relevant.

The court, however, agrees with other judges in this district who have concluded it is "appropriate for a court to consider the aggregate or cumulative effects of an accommodation when multiple, similarly situated employees request the same accommodation," because "[t]his approach comports with both Supreme Court and [EEOC] guidance." *Hailey*, 2024 WL 4253238, at *9; *see also Sano*, 2024 WL 4979429, at *6; *Bird v. Alanson M. Randol, D.D.S., P.C.*, 6:23-cv-01678-MC, 2025 WL 553580, at *8 (D. Or. Feb. 19, 2025) (holding that defendants "reasonably concluded that the cumulative cost of accommodating [multiple employees] would be substantial"). Under *Groff*, a court assessing undue hardship must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size, and operating cost of the employer." 600 U.S. at 470-71. "These factors naturally include the aggregate effects when multiple employees are granted the same accommodation." *Hailey*, 2024 WL 4253238, at *9 (quotation marks omitted). Indeed, the Supreme Court in *Trans World Airlines* criticized the dissent's assertion that a proposed accommodation would have imposed only a *de minimis* cost, because the dissent "fail[ed] to take account of the likelihood that a company as large as [defendant] may have many employees whose religious observances, like [plaintiff]'s, prohibit them from working on Saturdays or Sundays." 432 U.S. at 84 n.15.

The costs of testing, monetary and its effect on patient care, are likely enough for Legacy to show undue hardship. But there's more—exposure of its patients and other employees to increased risk of infection by allowing Krone to work while unvaccinated. The scientific consensus in the summer of 2021 was that the vaccines were safe and effective at preventing infection, and that vaccinated individuals tended to carry a lower viral load even when infected (making it less likely that they would spread COVID-19 to others). (Muller Decl. ¶ 34; Cohen Report ¶¶ 28-38 (collecting studies).) And guidance from both the Centers for Disease Control (CDC) and World Health Organization (WHO) around that time recommended vaccination in addition to other preventive measures. (Muller Decl. ¶¶ 38 n.2 (pointing to CDC guidance issued August 13, 2021, and WHO guidance issued July 14, 2021).)

And PPE, social distancing, and testing had their limits: PPE could not be worn continuously and could be worn improperly; social distancing was impossible in the TRACU and other departments providing direct patient care; and testing was not perfectly accurate, was subject to delays, and an infected person could infect others even before testing positive. (Muller Decl. ¶¶ 34-37; Cohen Report ¶¶ 33-38.) Faced with those limitations, Legacy's SLT concluded that requiring vaccination was the only way to fulfill its "responsibility to provide the highest possible level of [care]" to its patients, many of whom were immunocompromised or had a greater risk of complications from COVID-19. (*Id.* ¶¶ 5-6, 34.)

There was also a heightened threat from COVID-19, particularly the new Delta variant, that confronted Legacy when it implemented the vaccine requirement in the summer of 2021. At that time, both internal and external forecasts predicted drastic increases in COVID-19 infections and hospitalizations. (Muller Decl. ¶ 29 & Exs. 17-19.) In July and August 2021, Legacy

experienced four different COVID-19 outbreaks within its facilities, exposing hundreds of staff members. (Muller Decl. ¶ 29.)

Given the information Legacy had then, it was reasonable for it to conclude that the new COVID-19 variants posed a significant threat to the health of its patients and its ability to staff its facilities, that vaccination would reduce the likelihood of infection and transmission, and that allowing unvaccinated employees to continue working in person would create "an unreasonable health and safety risk." (Muller Decl. ¶ 40); s*ee also Bird*, 2025 WL 553580, at *8 (granting motion for summary judgment based on undue hardship defense, explaining "Defendants were responsible for the health and safety of their patients and staff during an unpredictable time and, based on the information that was available to them, Defendants reasonably believed new COVID-19 variants to be a significant threat" and reasonably "believed that the vaccine would be effective"); *Hailey*, 2024 WL 4253238, at *14 (same, noting that Legacy reasonably concluded that "unvaccinated employees working in-person would put other staff members and a vulnerable patient population at risk," which would in turn "compromise [Legacy]'s mission to serve the community and keep it safe").

Although Krone disputes that there was any scientific consensus in August 2021 and that the vaccines provided any additional benefit over other mitigation measures in reducing COVID-19 transmission and infection (MSJ Resp. at 5-7), she hasn't supported that view with any admissible evidence. She has not refuted Legacy's evidence of the effectiveness of the vaccine, the vaccine-related guidance from the CDC and WHO in the summer of 2021, the shortcomings of other preventive measures, or the cumulative costs of accommodating hundreds of employees who sought exemptions from the vaccine requirement. In sum, Legacy has demonstrated that it

Page 22 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

would have been an undue hardship to allow unvaccinated employees to continue working in person at its facilities.

As to other potential accommodations, the record shows (and Krone concedes) that Krone could not perform her work remotely and that Legacy had insufficient remote positions to accommodate all employees seeking exemptions from the vaccine requirement. (Clouser Decl. ¶ 15; Muller Decl. ¶ 41; *see also* MSJ Resp.) And it is undisputed that "indefinite unpaid leave" would not have been a "reasonable accommodation." (MSJ Resp. at 11; *see also* MSJ; MSJ Reply.)

Despite Legacy's evidence of undue hardship, Krone contends that Legacy cannot prevail on summary judgment because Legacy did not perform an individualized analysis of whether Krone's request could be accommodated. She relies on *Malone*, where another court in this district denied summary judgment because there was no evidence that Legacy had "made an individualized inquiry into whether Plaintiff could be accommodated" and because the record in that case "[was] murky as to what other safety precautions or positions existed at the time, what accommodations were considered for Plaintiff, and why those would be an undue hardship on defendant's business." 2024 WL 3316167, at *4. Consideration of *Malone* does not change the court's recommendation.

As the court in *Malone* observed, *Groff* clarified that it is not enough for an employer to merely "assess the reasonableness of a particular possible accommodation or accommodations." *Groff*, 600 U.S. at 473. Rather, if there are "other options" available, those options too must be considered—an employer can only prevail on undue hardship if it shows there was *no* reasonable means to accommodate the employee's religion. *Id.* at 473 (citing *Adeyeye v. Heartland*

Page 23 – AMENDED FINDINGS AND RECOMMENDATION
*Krone v. Legacy Health*, 3:22-cv-01986-AR

*Sweeteners, LLC*, 721 F.3d 444, 455 (7th Cir. 2013) (holding that employer's undue hardship defense failed where a reasonable jury could conclude that one of the accommodation options proposed would not have imposed an undue hardship)); *see also Hardison*, 432 U.S. at 78 (employer prevailed on summary judgment where *each* proposed accommodation would have imposed an undue hardship).

But that is different from Krone's proposal that employers must perform a separate, individualized inquiry into the reasonableness of accommodating each of many similarly situated employees. It would make little sense to require the employer to engage in such a "futile act." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988). As the Ninth Circuit has explained, an employer can prevail on undue hardship without making any good faith efforts to accommodate the employee's religious practice. *Id.* ("If an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act."); *Heller*, 8 F.3d at 1440 ("The employer need not make such an effort if it can show that any accommodation would impose undue hardship."). Indeed, Krone elsewhere acknowledges that, to prevail on summary judgment, Legacy must "prove that it *either* initiated good faith efforts to accommodate reasonably the employee's religious practices *or* that it could not reasonably accommodate the employee without undue hardship." (MSJ Resp. at 10 (emphasis added).) Legacy need not prove both.

Legacy has demonstrated that accommodating Krone's religious practice would have imposed on it an undue hardship. Legacy is therefore entitled to summary judgment on Krone's claims.

\ \ \ \ \

**CONCLUSION**

Legacy's Motion to Strike (ECF 29) should be GRANTED IN PART and DENIED IN PART as moot. Because Legacy has demonstrated that accommodating Krone's religious beliefs would have imposed on Legacy an undue hardship, Legacy's Motion for Summary Judgment (ECF 14) should be GRANTED.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within fourteen days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: May 6, 2025

_____
JEFF ARMISTEAD
United States Magistrate Judge